Victor Sandoval (California Bar No. 344461)
ALMEIDA LAW GROUP LLC
3415 S. Sepulveda Blvd. Ste 1121
Los Angeles, CA 90034
310-896-5813
victor@almeidalawgroup.com
*Attorney for Plaintiff & the Putative Classes*
*[Additional attorney on signature page]*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

| | |
|---|---|
| KRISTY WILCE, *individually and on behalf of all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>WILLOW HEALTH SERVICES, INC.,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>1. VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §2510<br>2. VIOLATIONS OF CALIFORNIA INVASION OF PRIVACY ACT CAL. PENAL CODE § 631<br>3. VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE § 632<br>4. VIOLATIONS OF CONFIDENTIALITY OF MEDICAL INFORMATION ACT CAL. CIV. CODE §§ 56.06, 56.10, 56.101, 56.36<br>5. VIOLATIONS OF CALIFORNIA CONSUMER PRIVACY ACT CAL. CIV. CODE § 1798.100(A) AND (B)<br>6. VIOLATIONS OF CALIFORNIA CONSUMER PRIVACY ACT, CAL. CIV. CODE § 1798.100(C)<br>7. VIOLATIONS OF CALIFORNIA CONSUMER PRIVACY ACT, CAL. CIV. CODE § 1798.150<br>8. BREACH OF CONTRACT<br>9. UNJUST ENRICHMENT<br>10. INVASION OF PRIVACY |

Plaintiff Kristy Wilce, individually and on behalf of all others similarly situated ("Plaintiff"), brings this class action lawsuit against Willow Health Services, Inc. ("Willow" or "Defendant") and alleges, upon personal knowledge as to their own actions and their counsel's investigation and upon information and good faith belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This class action lawsuit addresses Defendant's improper, unauthorized, and illegal disclosure of users' personally identifiable information ("PII") and/or protected health information ("PHI") (collectively referred to as "PII and PHI") to third-party advertising platforms and data analytics companies without those users' knowledge or consent.

2. The market for glucagon-like peptide-1 ("GLP-1") medications has experienced explosive growth in recent years, with approximately 20 million Americans using drugs like Wegovy, Ozempic, Mounjaro, and Zepbound for weight loss and diabetes management.[1]

3. Defendant is a participant in this market, serving as an online platform for GLP-1 prescription services to patients across the United States.

4. Defendant owns, maintains, and controls the web domains www.willowhealth.com, www.startwillow.com and app.willowhealth.com, along with related properties and subdomains (collectively the "Website"). Through the Website, users solicit telehealth services and health products, especially prescriptions of GLP-1 medications.

5. Whereas the Website purports to be no more than a healthcare platform, it is in reality Defendant's conduit to capture and transmit the PII and PHI of Website visitors and customers to third-party marketers. Through trackers embedded on the Website, and especially in the intake quiz section where users enter their sensitive health information including weight statistics and health conditions, third-party marketing companies collect user data including PII and PHI.

6. Medical data like this PHI is among the most valuable commodities in the digital economy. Industry analysts estimate that the global healthcare data market exceeded $34 billion in 2022 and is projected to reach $105 billion by 2030, representing a compound annual growth rate of

[1] Gabby Landsverk, *A Guide to Navigating the Wild West of the Online GLP-1 Market,* MEN'S HEALTH (July 2, 2025), https://perma.cc/C3UJ-W44W (last visited Jan. 8, 2026).

over 15%.[2]

7. Individual health records command premium prices in both legitimate and illicit markets, valued as much as fifty times more than credit card information due to their comprehensive nature and permanence.[3]

8. Third-party data brokers are particularly interested in this data, which they use to create detailed psychographic profiles for targeted advertisements and predictive modeling, and which can be sold and resold to advertisers, social media companies, or hackers who may use this data to orchestrate social engineering attacks.[4]

9. As a healthcare provider handling sensitive medical information, Defendant has an obligation not to disclose this data without the consent of those who provided it, and to protect the privacy and confidentiality of PII and PHI in its possession, custody or control.

10. This obligation is not merely ethical—it is mandated by federal and state law, including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

11. Despite these obligations, Defendant has systematically violated its users' privacy rights by using tracking technologies in its Website that capture and transmit PII and PHI to third parties for marketing and analytics purposes including, but not limited to, selling PII and PHI to advertisers, profiling users without their knowledge, targeting users with advertisements based on their medical conditions, and other improper uses of PII and PHI.

12. These disclosures occur without Website users' knowledge, consent, or authorization, in direct violation of federal and state privacy laws.

13. The unauthorized disclosure of medical information is a fundamental breach of trust in any relationship between one party seeking care and another purporting to offer it.

14. When users seek medical care through the Website, they reasonably expect that their

---

[2] *Healthcare Analytics Market To Reach $167.0 Billion By 2030*, https://perma.cc/9G3Z-YP7L (last visited Jan. 8, 2026).

[3] Herjavec Group*, 2021-2022 Healthcare Cybersecurity Report*, https://perma.cc/B9SH-CB4B (last visited Jan. 8, 2026).

[4] *Id.*

sensitive health information—including health conditions, prescription medications, and medical histories—will remain confidential between them and their healthcare providers.

15. Instead, this information has been shared with technology companies and data brokers who use it for their own commercial purposes.

16. This action seeks redress against Defendant for its unlawful practices and to obtain relief for Plaintiff and other affected parties whose privacy rights have been violated through the unauthorized collection and disclosure of their PII and PHI.

17. Plaintiff brings this action on behalf of herself and the putative Classes defined below to secure redress for: (i) violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2510; (ii) violations of the California Invasion of Privacy Act, Cal. Penal Code § 631; (iii) violations of the California Invasion of Privacy Act, Cal. Penal Code §632; (iv) violations of the Confidentiality of Medical Information Act, Cal. Civ. Code §§ 56.06, 56.10, 56.101; (v) violations of the California Consumer Privacy Act, Cal. Civ. Code §§ 1798.100(a); (vi) violations of the California Consumer Privacy Act, Cal. Civ. Code § 1798.100(c); (vii) violations of the California Consumer Privacy Act, Cal. Civ. Code § 1798.150(a)(1); (viii) Breach of Contract; (ix) Unjust Enrichment; and (x) Invasion of Privacy.

## **PARTIES**

18. Plaintiff Kristy Wilce is an adult citizen who lives, and at all relevant times has lived, in Woodland, California and who began using the Website in December 2024.

19. Defendant is a corporation incorporated and existing under the laws of the State of Delaware with its principal place of business located at 1401 Lavaca St PMB 41529, Austin, TX 78701.

## **JURISDICTION & VENUE**

20. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action lawsuit wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of each of the classes is a citizen of a state different from Defendant.

21. This Court has personal jurisdiction over Defendant because Defendant purposefully availed itself of the privilege of conducting business in California by operating an interactive website accessible to and used by California residents, soliciting customers in California, collecting personal and medical information from California residents, and deriving revenue from California consumers. Defendant's tortious conduct—including the unauthorized interception and disclosure of Plaintiff's communications and medical information—was directed at and caused harm to Plaintiff in California.

22. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiff resides in this District, accessed the Website from this District, and Plaintiff's personal and medical information was collected, intercepted, and disclosed to third parties while Plaintiff was located in this District.

23. Pursuant to Local Rule 120(d), assignment to the Sacramento Division is proper because Plaintiff resides in Yolo County, accessed the Website from Yolo County, and a substantial part of the events giving rise to the claims—including the interception, collection, and disclosure of Plaintiff's personal and protected health information through her use of the Website—occurred in Yolo County, which is within the Sacramento Division.

## FACTUAL ALLEGATIONS

### I. DATA TRACKING IN THE TELEHEALTH INDUSTRY

24. Responding to the rapid growth in demand for GLP-1 products, the market among companies such as Ro, Hims & Hers, Calibrate, Noom, and others that offer virtual prescriptions and access to these medications is extremely competitive.[5]

25. These telehealth companies rely heavily on digital advertising for customer acquisition, and many of them use website tracking technologies to measure advertising

[5] Katie Palmer, *How Digital Health Companies Are Capitalizing on the GLP-1 Boom*, CNBC (May 25, 2024), https://perma.cc/EC5G-9SZ9 (last visited Jan. 8, 2026).

effectiveness and retarget prospective patients.[6]

26. A December 2022 investigation by journalists at *The Markup* and STAT News examined 50 direct-to-consumer telehealth companies and found that 49 had third-party tracking code with the potential to collect and to share sensitive health data with various adtech platforms such as Facebook and Google, among many others.[7]

27. On thirteen websites, trackers from Meta, Google, TikTok, and other platforms collected patients' answers to medical intake questions about health conditions, medications, and treatment needs.[8]

28. On 25 telehealth sites—including those operated by Hims & Hers, Ro, and Thirty Madison—tracking codes informed tech platforms when users added prescription medications to shopping carts or completed treatment subscriptions.[9]

29. Recognizing the sensitivity of the data shared on telehealth sites and the potential for misuse of this information, federal regulators have aggressively pursued telehealth companies for improper data sharing.

30. The Federal Trade Commission ("FTC"), for example, has reached major settlements with BetterHelp ($7.8 million for sharing mental health data with Facebook, Snapchat, and Pinterest),[10] GoodRx ($1.5 million for sharing prescription data with Facebook and

---

[6] Emily Baumgaertner, *Cerebral, Telehealth Startups Face Privacy Pushback over Ad Models*, STAT NEWS (Mar. 22, 2023), https://perma.cc/3CTC-UKR7 (last visited Jan. 8, 2026).

[7] Todd Feathers *et al.*, "*Out Of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies*, THE MARKUP (Dec. 13, 2022), https://perma.cc/GG6Y-W8NQ (last visited Jan. 8, 2026).

[8] *Id.*

[9] *Id.*

[10] *Fed. Trade Comm'n, FTC to Ban BetterHelp from Revealing Consumers' Data, Including Sensitive Mental Health Information, to Facebook and Others for Targeted Advertising* (Mar. 2, 2023), https://perma.cc/P74E-4R37 (last visited Jan. 28, 2026).

Google),[11] and Cerebral (affecting 3.1 million patients whose data was shared with Meta, Google, and TikTok).[12]

31. In July 2023, the FTC and HHS Office for Civil Rights jointly warned 130 hospital systems and telehealth providers about privacy risks from tracking technologies.[13]

32. Despite these enforcement actions, telehealth providers continue to extract and sell user data to third parties for advertising purposes, exploiting the popularity of their products and the sensitivity of their customers' needs in order to profit through undisclosed third-party advertising integrations.

33. Third-party data brokers that are embedded in health apps and websites are extremely interested in this valuable data, which they use to create detailed psychographic profiles for targeted advertisements and predictive modeling, and which can be sold and resold to advertisers, social media companies, or hackers who may use this data to orchestrate social engineering attacks.[14]

## II. USERS' SENSITIVE INFORMATION, INCLUDING MEDICAL DATA, IS SOLICITED BY AND DIVULGED TO DEFENDANT THROUGH ITS WEBSITE.

34. Defendant owns and operates the Website as a telehealth platform that provides virtual weight loss consultations and prescription services for weight management medications.

35. Thousands of people rely on Defendant and its services, including the Website, as their primary conduit to weight loss treatment and related health services.

36. The Website is marketed as offering specialized weight loss programs with access to prescription medications like GLP-1 agonists for weight management solutions.

---

[11] *Fed. Trade Comm'n, FTC Enforcement Action to Bar GoodRx from Sharing Consumers' Sensitive Health Info for Advertising* (Feb. 1, 2023), https://perma.cc/3H6L-JQ46 (last visited Jan. 28, 2026).

[12] *Pixel Use Results in Impermissible Disclosure of the PHI 3.1 Million Cerebral Platform Users*, HIPAA JOURNAL (Mar. 13, 2023), https://perma.cc/M6RJ-K3HV (last visited Jan. 8, 2026).

[13] *Fed. Trade Comm'n, FTC and HHS Warn Hospital Systems and Telehealth Providers About Privacy and Security Risks from Online Tracking Technologies* (July 20, 2023), https://perma.cc/3SF7-NVYA (last visited Jan. 8, 2026).

[14] *Id.*

37. The Website has achieved significant market penetration in the rapidly growing telehealth weight loss market, capitalizing on demand for GLP-1 medications and other weight loss treatments.

38. Defendant markets its Website as providing confidential, personalized weight loss solutions and emphasizes the private nature of their healthcare services.

39. Unlike traditional healthcare providers who collect patient information after establishing a provider-patient relationship, the Website requires users to submit health information through a comprehensive onboarding quiz that requests detailed medical information.

40. The Website contains numerous first- and third-party tracking implementations that measure and record user data. These tracking technologies, including web beacons, pixels, and software development kits ("SDKs"), are small pieces of code that developers integrate directly into their websites to track user behavior and transmit data to third-party platforms—in this case, transmitting sensitive health information for advertising and analytics purposes.

41. Specifically, Defendant has deployed on the Website the Pinterest Pixel, Taboola Pixel, TikTok Pixel, and Microsoft's tracking products, among other third-party tracking tools (collectively, the "Tracking Technology").

42. By installing and using these Tracking Technologies, developers—including those who created the Website or have been responsible for their maintenance and updates—embed these companies' technologies enabling comprehensive data collection regarding users' health information, quiz responses, and personal identifiers.

### *A. Background on Pinterest's Web Tracking Activities*

43. Pinterest, Inc. ("Pinterest") has developed from a visual-discovery site into a sophisticated advertising and data-tracking platform that monitors users across third-party websites through the Pinterest Pixel.

44. As Pinterest expanded its advertising and commerce tools, it enhanced its tracking infrastructure to collect extensive behavioral and transactional information from users visiting Pixel-enabled sites.

45. Pinterest provides a suite of tracking tools—including the Pinterest Pixel, Ads

Manager, Enhanced Match, and the API for Conversions—that enable data collection, user matching, and ad optimization.

46. These tools allow websites to monitor user interactions, attribute conversions, build audiences, and improve advertising campaigns based on granular user-level data.

47. The Pinterest Pixel consists of two required components: Base Code, which must be installed on all pages to track visits, and Event Code, which must be placed on pages where conversion actions occur and which captures user actions—including purchases, sign-ups, add-to-cart events, and content views—and sends these details to Pinterest in real time.

48. As part of its tracking technology suite, Pinterest uses unique click-tracking parameters appended to ad-destination URLs to attribute subsequent user behavior across the website.

49. When users click Pinterest ads, these identifiers are stored in first-party cookies created by the Pixel, allowing Pinterest to track users' downstream behavior even after the initial click.

50. Because modern browsers block many third-party cookies, Pinterest relies on first-party cookies to maintain persistent tracking and improve attribution accuracy.

51. Pinterest's documentation confirms that first-party cookie usage is enabled by default and necessary for full measurement functionality.

52. Pinterest's API for Conversions allows server-to-server transmission of user actions, bypassing browser-level privacy protections such as cookie blocking, JavaScript limits, and ad blockers.

53. Pinterest instructs websites to send multiple identifiers—such as hashed emails, hashed phone numbers (E164 format), IP addresses, user agent strings, and Pinterest click IDs—to improve tracking and matching performance.

54. Pinterest expressly states that providing "more identifiers" increases match rates and tracking accuracy.

55. The combination of these identifiers enables Pinterest to track users regardless of whether they have Pinterest accounts.

56. For logged-in Pinterest users, first-party cookies and click-tracking identifiers automatically associate on-site behavior with individual Pinterest accounts.

57. As with other tracking pixels, Pinterest's Pixel loads invisibly via JavaScript, providing users no indication that their actions or identifiers are being transmitted to Pinterest.

58. Pinterest offers attribution windows of up to 90 days, allowing Pinterest to track and credit user actions months after any interaction with a Pinterest ad.

59. The Pixel's Event Code can capture custom user input, including names, email addresses, and phone numbers entered into forms, and transmit these identifiers directly to Pinterest.

60. Pinterest confirms that both the Pixel and the API support "user-provided identifiers" to increase measurement coverage and audience-building capabilities.

61. Together, Pinterest's Base Code, Event Code, click-tracking parameters, first-party cookies, server-side APIs, and identifier-matching systems create a comprehensive surveillance architecture capable of collecting and transmitting sensitive personal information from websites—including those handling health, financial, or similarly sensitive data.

***B. Background on ByteDance, Ltd.'s TikTok Analytics Pixel***

62. ByteDance, Ltd. operates TikTok, one of the world's largest social media companies, which generated approximately $8 billion in revenue from the United States in 2024, the majority of which was derived from selling advertising space.[15]

63. TikTok provides various "TikTok Business Products," enabling businesses and website owners to measure advertising performance, optimize campaigns, and reach target audiences.[16]

64. Among these products is the "TikTok Pixel," a snippet of code that can be embedded in webpages or mobile applications to collect and transmit information about user

---

[15] *TikTok Ad Revenue Worldwide, 2020-2027*, STATISTA, https://perma.cc/Z8U5-CEH9 (Last visited Jan. 8, 2026).

[16] *TikTok for Business*, https://perma.cc/QFR2-FE9K (Last visited Jan. 8, 2026).

interactions for analytics and ad targeting.[17]

65. TikTok's documentation indicates that the TikTok Pixel can detect and report specific user actions such as page views and purchases, thereby assisting advertisers in measuring conversions and user engagement.[18]

66. The TikTok Pixel can also capture identifiable user data that identifies individual users and tracks their browsing behavior across various websites.[19]

67. When a user accesses a webpage equipped with the TikTok Pixel, data regarding the user's interaction with that page may be transmitted to TikTok's servers in real time for analysis and ad targeting purposes.[20]

68. Notably, data transmission occurs only if the Pixel has been intentionally installed on a webpage. The website owner can configure which user actions are tracked and shared with TikTok.[21]

69. TikTok offers a feature called "Advanced Matching," which is designed to improve ad targeting and measurement by matching website visitors to TikTok user accounts, or other personally identifiable profiles created by TikTok to identify non-users.[22] Advanced Matching works by collecting personal identifiable information from website visitors—such as email addresses, phone numbers, and names—and transmitting this data to TikTok in hashed format.[23]

70. When Advanced Matching is enabled, the TikTok Pixel automatically captures user

---

[17] *See TikTok Pixel, TikTok Help Center*, https://perma.cc/AHT2-GFST (last visited Jan. 8, 2026).

[18] *About TikTok Pixel*, https://perma.cc/8CN3-C28L (last visited Jan. 28, 2026).

[19] *Report App Web, Offline, or CRM Events*, https://perma.cc/J8U5-RCYK (last visited Jan. 28, 2026).

[20] *TikTok Privacy Policy*, https://perma.cc/ZB3N-MX8R (last visited Jan. 8, 2026).

[21] *How to Set Up Events and Parameters*, https://perma.cc/4FR2-FEK2 (last visited Jan. 28, 2026).

[22] *Advanced Matching*, https://perma.cc/LL3H-MRUJ (last visited Jan. 28, 2026).

[23] *How to Set Up Automatic Advanced Matching,* https://perma.cc/YG3V-6KSX (last visited Jan. 28, 2026).

information entered into website forms or stored in the website's code, hashes this information using the SHA-256 cryptographic algorithm, and transmits the hashed values to TikTok's servers.[24] TikTok then compares these hashed values against its database of TikTok user information to identify matches.[25]

71. This process enables TikTok to link a user's anonymous browsing activity on a website to their identified TikTok account, thereby allowing TikTok to attribute specific website behaviors—including viewing health-related content or completing sensitive questionnaires—to known individuals.[26] The hashing process does not anonymize the data; rather, it enables TikTok to match website visitors to their existing user profiles while obscuring the data in transit.[27]

72. Through Advanced Matching, TikTok can receive and store associations between users' personal identifiers (email addresses, phone numbers) and their browsing behavior, including the specific URLs they visit and the content they view, even if users are not logged into TikTok or do not have the TikTok app installed on their devices.[28]

73. Implementation of the Pixel requires the website owner to follow a multi-step process that includes integrating TikTok-provided code and defining the events to be tracked.[29]

74. TikTok states that using the Pixel helps website owners "measure traffic on your

---

[24] *SHA-256 Algorithm*, https://perma.cc/48QB-MZ8S (last visited Jan. 8, 2026).

[25] *Understanding TikTok's Events API: Advanced Matching*, https://perma.cc/AL7H-SP7P (last visited Jan. 8, 2026); *see also Improve Performance with Advanced Matching*, https://perma.cc/J3HN-ACQB (last visited Jan. 8, 2026) ("[Advanced Matching] helps us better attribute your conversions and find more people similar to those converting on your website").

[26] *Advanced Matching*, supra n. 22.

[27] *User Privacy and Advanced Matching*, https://perma.cc/JF9A-NY7Z (last visited Jan. 8, 2026); *see also Events API Overview*, https://perma.cc/JV8R-6KVT (last visited Jan. 8, 2026) ("Personal information is hashed on the client side before being sent to TikTok's servers, where it is used to match users to their TikTok profiles.").

[28] *Advanced Matching, supra* n. 22.

[29] *TikTok Business Help Center*, TikTok, https://perma.cc/D8QR-KDPN (last visited Jan. 8, 2026).

website, measure ad campaign performance, optimize campaigns, and find new customers."[30]

75. As part of setting up the Pixel, website owners must agree to TikTok's Business Products Terms, under which owners affirm they have obtained any required user permissions or consents before transmitting data to TikTok.[31]

76. Consequently, any PII and PHI is only disclosed to TikTok if the website owner has lawful authority under applicable statutes and regulations.

### *C. Background on the Taboola Tracking Pixel*

77. Taboola operates as a sophisticated digital advertising network deploying comprehensive tracking technologies across third-party websites through its content discovery platform and programmatic advertising services.

78. Taboola provides website operators with a suite of tracking and analytics tools, including the Taboola Pixel, Taboola Ads Manager, Conversion API, and third-party tag integrations.[32]

79. The Taboola Pixel consists of two primary components: the Base Code that serves as the foundation for tracking traffic and funnel events like site visits, and Event Code designed to capture events defined by the website operator."[33]

80. Beyond the Base Code, Taboola requires website operators to install Event Code on specific pages where conversion events occur, tracking actions such as purchases, sign-ups, add-to-cart events, and content views.

81. These Event Codes capture granular details about user interactions and transmit them to Taboola's servers in real time.

---

[30] *TikTok Pixel & SDK*, *supra* n.18.

[31] *TikTok Business Products*, https://perma.cc/HFV2-HRNF.

[32] *Conversion Tracking Overview*, https://perma.cc/E9CE-ZLTQ (last visited Jan. 8, 2026); *Add Event Pixels* Manually, https://perma.cc/85DJ-9XUQ (last visited Jan. 8, 2026).

[33] *Add the Base Pixel Manually*, https://perma.cc/MJ2K-48V9 (last visited Jan. 8, 2026); *Realize Tracking Set Up Overview*, https://perma.cc/A7M3-R4KD (last visited Jan. 8, 2026).

82. The platform's documentation permits first-party cookie storage of the Click ID parameter to measure conversion events, indicating a persistent tracking mechanism that follows users throughout their browsing session.[34]

83. Taboola's pixel tracking extends beyond cookies through its Conversion API, which enables server-to-server integration that completely bypasses browser-based privacy controls.

84. This server-side tracking ensures that even users who have blocked JavaScript, disabled cookies, or installed ad blockers can still be tracked, as the data transmission occurs directly between website servers and Taboola's servers without any client-side interaction.[35]

85. Taboola's tracking capabilities enable collection of multiple personally identifiable information types. The platform's Conversion API documentation reveals that Taboola collects and processes hashed email addresses, hashed phone numbers, IP addresses, user agent strings, and the Click ID for user matching and attribution.[36]

86. Taboola's tracking platform employs a dual-layer identification system that extends its tracking reach beyond its own user base. Taboola operates primarily through click tracking alongside recording user IDs: when users click on Taboola-served advertisements, the platform assigns and records a unique Click ID that persists across browsing sessions. For users logged into Taboola accounts, the platform's pixels automatically identify individuals through first-party cookies and this Click ID parameter.

87. However, Taboola's tracking infrastructure captures individuals regardless of whether they have Taboola accounts through its Conversion API, which allows website operators to transmit email addresses, phone numbers, IP addresses, and user agent strings directly to Taboola's servers.[37]

---

[34] *How to Set Up and Track CRM-Based Conversions*, https://perma.cc/7S8M-9UQT (last visited Jan. 8, 2026).

[35] *How to Track Conversions Using Server-to-Server Integration (S2S*), https://perma.cc/NN39-LTEC (last visited Jan. 8, 2026).

[36] *Customer Information Parameters: Additional Customer Attributes Used to Help the System Match a Conversion Event Back to Their Users and Devices (E.g., Email, Phone, Mobile Ad IDs, and Click IDs)*, https://perma.cc/L6N3-6LWH (last visited Jan. 8, 2026).

[37] *How to Set Up the Taboola Conversions API*?, (Apr. 2, 2025), https://perma.cc/L6N3-6LWH

88. Individuals who have never created Taboola accounts can still be tracked and identified when they provide their device identifying information and other data sufficient to create a digital fingerprint for any purpose on a website that transmits this information to Taboola. This creates a comprehensive tracking network where both Taboola users and non-users can be monitored across the web through multiple identification vectors.[38]

89. Like other tracking pixels, Taboola's technology operates invisibly to users.

90. The pixel consists of JavaScript code that website operators embed in their HTML, which loads automatically when users visit pages without any visible indication.

91. Users have no way of knowing their behavior is being monitored, their email addresses are being collected, or their interactions are being transmitted to Taboola's servers.[39]

92. Taboola's tracking extends beyond the initial interaction through configurable attribution windows. The platform offers "post-engagement attribution windows" of up to 90 days, meaning that user actions can be tracked and attributed to Taboola advertisements for three months after any interaction.

93. During this extended period, all user behavior on websites with Taboola Pixels installed is monitored and linked back to their initial engagement with Taboola advertisements.

94. Beyond standard behavioral tracking, the Taboola Pixel's Event Code can be configured to capture custom input data entered by users on a website, including names, email addresses, and phone numbers.[40]

95. Website operators implement custom parameters within the Event Code to transmit user-submitted information directly to Taboola's servers whenever users interact with forms, input fields, or other data collection elements on the site.

---

(last visited Jan. 8, 2026).

[38] *Privacy Policy*, https://perma.cc/3JDF-H8H7 (last visited Feb. 3, 2026).

[39] *Taboola Pixel Overview*, https://perma.cc/A7M3-R4KD (last visited Jan. 8, 2026).

[40] *Submitting First Party Data*, https://perma.cc/NSQE-DNQZ (last visited Jan. 8, 2026).

96. This functionality enables Taboola to receive and process sensitive personal information beyond standard behavioral tracking metrics, creating detailed user profiles that link specific individuals to their browsing activities and on-site interactions.

97. Such custom data collection occurs automatically upon user interaction with the configured elements, and users entering their email address or phone number into a website form have no indication that this information will be simultaneously captured by Taboola's tracking technology and shared with the advertising platform for advertising purposes.[41]

98. Taboola's comprehensive tracking infrastructure—combining Base Code on every page, Event Codes for specific actions, Click ID tracking, first-party cookies, server-side APIs, and multiple personally identifiable information types—creates an environment where sensitive user data can be easily collected and transmitted to Taboola's servers, particularly when deployed on websites handling health, financial, or other sensitive information.[42]

***D. Background on Microsoft Tracking Products***

99. Microsoft Corporation ("Microsoft") is a Washington-based corporation that operates the Microsoft Bing Ads network and the Microsoft Clarity analytics platform. Bing Ads enables behavioral advertising across Microsoft-owned and partner properties, while Clarity captures granular behavioral information, including mouse movements, scroll patterns, click locations, page structure, and engagement with on-page components.

100. Defendant deployed both Bing Ads and Microsoft Clarity on its Website. Defendant's Website network traffic shows Clarity and Bing receiving full-string URLs which disclose that users were seeking health care services. Clarity's payloads confirm that session-level identifiers, events,

---

[41] *Tracking Dynamic Conversion Values*, https://perma.cc/5CSM-4AEU (last visited Jan. 8, 2026).

[42] *Taboola Pixel Overview*, https://perma.cc/A7M3-R4KD (last visited Jan. 8, 2026) (describing the Taboola Pixel as "a javascript code that you implement on your website" that "gathers data about users behavior and actions on your website, like page visits, account creation, purchases, time per session, and many more"); *Add the Base Pixel Manually*, https://perma.cc/MJ2K-48V9 (last visited Jan. 8, 2026) (providing base pixel code implementation); *Pixels: Tracking Your Audience Across the Web (and Email)* (June 22, 2025), https://perma.cc/N2YB-RF4A (last visited Jan. 8, 2026) (explaining that tracking pixels collect "IP address, browser type, device information, and actions on the page").

and page structures were transmitted while users completed or viewed pages disclosing that consumers were seeking health care services.

101. Defendant's Website configuration transmitted Microsoft's persistent tracking identifiers, including the MUID (Microsoft User ID) cookie used across Bing Ads and Microsoft properties, which Microsoft processes and uses to track a specific user's behavior across page views, reconstruct session-level interaction, and link that behavioral data to its advertising and analytics infrastructure.

## III. WEBSITE USERS' PII AND PHI IS INTERCEPTED BY THE WEBSITE'S TRACKING TECHNOLOGY WITHOUT CONSENT.

102. Defendant maintains and owns the Website and has made the conscious and intentional decision to install the Tracking Technology on the Website, thereby allowing the providers of the Tracking Technology and other third-party trackers that may be present on the Website, to intercept and to collect all user interactions—including responses to sensitive health screening questions—in real time.

103. Individuals who visit the Website are not immediately presented with the option to create an account and do not consent to any terms of use, privacy policy or any other page where tracking activities are disclosed.

104. Rather, upon accessing the Website, the user is presented with buttons inducing them to "Take the Quiz." This leads the user to an onboarding assessment quiz before they have an opportunity to consent to any terms of service or privacy policy.




105. Users are directed to a survey through which they are required to answer questions on sensitive health topics and to provide PII like their names and email addresses. Examples of the questions asked in the quiz are reproduced below.









106. The user is then directed to a "Free Visit" page where he or she enters personal information including his or her name and email address.

107. The user is then asked additional questions, some of which request sensitive information, as seen below.


willow
Nice to meet you, dee! Let's keep in touch.
Create an account to save your progress, and let us know where we should contact you about your Willow experience.
Email
Phone
Password
Confirm Password
Password must be at least 8 characters.


willow
← Back
Health Questionnaire
What medications are you currently on?
Your medical history helps us determine if you're eligible for Willow's program.
Medication
Add
Press enter to add medication
NONE







108. Finally, the onboarding process indicates that a user is eligible for GLP-1 prescription and is provided with the option to select specific medications from Defendant's website.

109. The Tracking Technology is active throughout the quiz and is set up to capture user interactions and transmit this data to at least Taboola and TikTok. The Pinterest Pixel is present in the onboarding section following the quiz.

110. The Taboola Pixel is active on each page of the intake quiz and onboarding process. It captures a user's page views, clicks on specific inputs including medical conditions, weight

loss goals, and interest in GLP-1 products. The collection of clicks on pages such as those seen above, on which clicks correspond to private medical information, is tantamount to the interception of medical information.

111. The Taboola Pixel simultaneously transmits a unique user identifier that enables Taboola to track the user across its network of over 9,000 publisher websites.

112. The Pinterest Pixel captures and transmits to Pinterest each specific URL the user visits as she progresses through the onboarding process, along with the user's personally identifiable Pinterest user identifier (the "TID" parameter in the screenshot of the network traffic below).


event: PageVisit
ed: {"name":""}
tid: 2613173263141
pd: {"pin_unauth":"dWlkPVpqVTFNV00yWXpjdFl6WXdaUzAwWWpZNExXRXlaak10TVRnNVkyUXlNak15TVdaaw","np":"segment","em":"45e7a575d2964fd29c3f5e4555b3c38c2c113eca76aee2ec562069f389cd0272"}
cb: 1767848225790
dep: 4,TAGS_RECEIVED
stc: true
ad: {"loc":"https://app.startwillow.com/onboarding/questionnaire/have-allergies","ref":""},"if":false,"sh":982,"sw":1512,"mh":"817db39b","is_eu":false,"ecm_enabled":false}


113. As constructed on the website, Pinterest's web tracking technology captures and transmits page names, the text and format of the page, and user clicks and interactions with the page and its contents. In the context of the onboarding process, where users provide additional information through form inputs and selections, Pinterest intercepts users' sensitive personal and health information.

114. Pinterest's web tracking technology also captures and stores user identities entered on the Website through features like Pinterest's tracking events which transmit PII to Pinterest.

115. The TikTok Advanced Matching pixel is also set up to capture user text inputs and activity, including clicks, on every page of the intake and onboarding process.

```
window[window["TiktokAnalyticsObject"]]._plugins = {
    "AdvancedMatching": true,
    "AutoAdvancedMatching": true,
    "AutoClick": true,
    "AutoConfig": true,
    "Callback": true,
    "DiagnosticsConsole": true,
    "EnableLPV": true,
    "EnrichIpv6": true,
    "EnrichIpv6V2": true,
    "EventBuilder": true,
    "EventBuilderRuleEngine": false,
    "HistoryObserver": true,
    "Identify": true,
    "JSBridge": false,
    "Metadata": true,
    "Monitor": true,
    "PageData": true,
    "PerformanceInteraction": false,
    "RuntimeMeasurement": true,
    "Shopify": true,
    "WebFL": false
};
```

116. The Tracking Technology captures the sensitive health information and unique identifiers that users provide through the quiz and onboarding process and transmits this data to third parties including Taboola and TikTok during the quiz, and Pinterest during onboarding. Therefore, individuals who complete the quiz and onboarding are tracked and uniquely identified through the third parties' capture of their identifying characteristics like full name and email address, as well as through unique user identifiers assigned by each platform's tracking technology.

117. At no point during the quiz process does the user consent to the Tracking Technology capturing answers to these highly sensitive questions, the fact that the user is seeking health care services, or to any similar web tracking tool collecting user data to create personalized, identifiable profiles combining the sensitive data entered on the Website with users' broader web browsing activity.

118. Defendant's privacy policy (the "Privacy Policy") does not provide adequate notice of the tracking that Defendant permits on its Website. Far from disclosing its tracking activities, the Privacy Policy merely states that "cookies or similar technologies may be used to deliver advertisements that are more relevant to you and your interests" without disclosing that a user's identity and interactions with the site, including answers to sensitive questions, are transmitted to third parties who use this data for marketing and targeted advertising not just on the Website but across the internet.

119. Furthermore, the Privacy Policy fails to disclose that user data is transmitted to advertising platforms such as Taboola, Pinterest, Microsoft, or TikTok. The Privacy Policy emphasizes Defendant's commitment to HIPAA compliance and data security, noting that "Willow Health Services may be considered a 'business associate'" under HIPAA, and assuring users that Defendant obtains "explicit authorization" before using protected health information for marketing purposes, while making no mention of the real-time transmission of sensitive medical information to third-party advertising networks that occurs throughout the intake quiz and onboarding process.[43]

120. The Privacy Policy's generic disclaimer that Defendant has "no control over, and assume[s] no responsibility for the content, privacy policies or practices of any third-party sites or services" does not constitute adequate disclosure that Defendant actively transmits users' sensitive health data to these third parties through tracking pixels embedded on the Website.[44]

121. Further, the Privacy Policy creates the false expectation that users' information is not shared with third parties by falsely representing that Defendant "does not, to the best of our knowledge, sell or rent personal information that we have collected or retained about you to any other third-party for any purpose. Accordingly, we do not offer individuals the ability to 'opt-out' of the selling or renting of personal information because we do not engage in those practices."[45]

---

[43] *Privacy Policy*, https://perma.cc/652F-96X5 (Jan. 8, 2026).

[44] *Id.*

[45] *Id.*; *see also* Cal. Civ. Code § 1798.140 (defining "sell").

## IV. REPRESENTATIVE PLAINTIFF'S EXPERIENCE.

122. Plaintiff Kristy Wilce currently resides (and all times herein relevant has resided) in Woodland, California.

123. Beginning in December 2024 and afterward, while living and physically present in California, Plaintiff Wilce accessed the Website to search for GLP-1 treatment options.

124. During this visit, Plaintiff Wilce completed the initial quiz process, which required her to input answers to sensitive questions including her weight, height, weight loss goals, medical history, and current medical regimen.

125. After completing the intake quiz, Plaintiff Wilce navigated to and selected a prescription for the GLP-1 injectable product through Defendant's Website.

126. When answering the questions in the intake quiz and onboarding questionnaire, receiving a prescription for GLP-1 injectable products, and purchasing these products through Defendant's Website, Plaintiff Wilce's PHI and PII, including her weight, weight loss goals, eligibility for GLP-1 prescriptions, and selection of prescription, were intercepted by the Tracking Technologies.

127. At no point before or during this process did Plaintiff Wilce consent to her answers being recorded as described herein.

128. Plaintiff Wilce did not consent to have her data captured by the Tracking Technology present on every page of the quiz or to have her communications intercepted by third parties when she took the quiz.

129. As discussed *supra*, the Privacy Policy did not notify Plaintiff Wilce that her interactions with the Website would be shared with third parties through the Tracking Technology and, in fact, falsely represented that they would not be.

130. Plaintiff Wilce was unaware at the time that her information was being captured in real time by the Tracking Technology present on every page of the quiz and disclosed to Taboola, Pinterest and TikTok, which collect user data from across the web to create personalized, identifiable profiles combining the sensitive data entered on the Website with users' web browsing activity.

131. Had she known that Defendant was using the Tracking Technology on every page

of the quiz to capture her answers to sensitive questions, and that Taboola, Pinterest and TikTok collect user data from across the web to create personalized, identifiable profiles combining the sensitive data entered on the Website with her web browsing activity, Plaintiff would not have used the Website or would have limited the information provided.

132. As a result of Defendant's conduct, Plaintiff's privacy rights were violated, and Plaintiff suffered harm in the form of receiving unwanted targeted advertisements related to her use of GLP-1 products, loss of control over her private health data, increased anxiety due to unknown parties accessing sensitive data, loss of the benefit of the bargain in keeping or exchanging her private data, and other harms related to the undisclosed and non-consenting transmission of PHI and PII.

## CLASS ACTION ALLEGATIONS

133. Plaintiff, on behalf of herself and all others similarly situated, seeks relief under Federal Rule of Civil Procedure 23 on behalf of the following class and subclass (together the "Classes"):

**The Nationwide Class:**

> All individuals who used the Website and had their personal information or medical information collected, disclosed, or transmitted to third parties without their knowledge or consent.

**The California Subclass:**

> All individuals who, while residing in California, used the Website and had their personal information or medical information collected, disclosed, or transmitted to third parties without their knowledge or consent.

134. The following people are excluded from the Nationwide Class and the California Subclass: (i) any judge or magistrate presiding over this action and members of their families; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendant or its parent has a controlling interest, and their current or former officers and directors; (iii) persons who properly execute and file a timely request for exclusion from the Nationwide Class and the California Subclass; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such

excluded persons.

135. Plaintiff reserves the right to revise or amend the class definitions based on the discovery of new information.

136. **Numerosity:** The exact number of members of the Classes is unknown but, upon information and good faith belief, it is estimated to number in the hundreds of thousands, and individual joinder of these claims is therefore wholly impracticable. Members of the Classes can be readily identified through Defendant's records and objective criteria, and notice can be provided through techniques similar to those customarily used in other class action lawsuits.

137. **Typicality:** Plaintiff's claims are typical of the claims of other members of the Classes in that Plaintiff and the members of the Classes sustained damages arising out of Defendant's wrongful conduct, misrepresentations, false statements, concealment, and unlawful practices, and Plaintiff and members of the Classes sustained similar injuries and damages, as a result of Defendant's uniform illegal conduct.

138. **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that conflict with or are antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff.

139. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the Classes and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not limited to the following:

a. Whether Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.*;

b. Whether Defendant violated the California Invasion of Privacy Act, Cal. Penal Code § 631;

c. Whether Defendant's use of Tracking Technology is an unauthorized interception of electronic communications;

d. Whether Defendant unlawfully intercepted and manipulated user communications;

e. Whether Defendant was unjustly enriched by collecting and monetizing class members' PHI;

f. Whether Defendant's practices violated healthcare privacy laws and regulations;

g. Whether Defendant breached a contract with Plaintiff and class members;

h. Whether Defendant was unjustly enriched by intercepting class members' communications;

i. Whether Defendant's representations on the Website were deceptive;

j. Whether Plaintiff and class members are entitled to damages and injunctive relief.

140. **<u>Superiority</u>:** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that class-wide adjudication will provide a realistic means for members of the Classes to receive monetary relief; the monetary relief suffered by members of the Classes may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Classes may be unaware that they have equitable recourse for the conduct alleged herein; and because issues common to members of the Classes can be effectively managed in a single proceeding. Plaintiff and her counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

141. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include:

a. Whether Defendant obtained proper consent before recording users' interactions with the Website or recording users' information through the Website;

b. Whether Defendant's actions violated Website visitors' reasonable expectations of privacy; and

c. Whether Defendant's collection of personal and medical information through Tracking Technology constitutes an invasion of privacy.

d. Finally, all members of the proposed Classes are readily ascertainable as Defendant has access to Class and Subclass Members' names, emails and physical addresses.

## <u>TOLLING, CONCEALMENT, AND ESTOPPEL</u>

142. The applicable statutes of limitations have been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein.

143. Defendant affirmatively hid its true actions and knowingly made statements that

were misleading and concealed the true nature of their conduct and operation. The circumstances of the third-party Tracking Technologies use on Defendant's Website, including that they are invisible to Website users, would lead reasonable users to believe third parties were not collecting their information or that Defendant was facilitating disclosure of the same.

144. Moreover, Plaintiff was ignorant of the information essential to pursue her claims, without any fault or lack of diligence on her own part.

145. Furthermore, under the circumstances Defendant was under a duty to disclose the true character, quality, and nature of its activities to Plaintiff. Defendant therefore is estopped from relying on any statute of limitations.

146. All applicable statutes of limitation also have been tolled by operation of the discovery rule. Specifically, Plaintiff and other members of the Classes could not have learned through the exercise of reasonable diligence of Defendant's conduct as alleged herein.

147. Accordingly, Plaintiff and the members of the Classes could not have reasonably discovered the truth about Defendant's practices until shortly before this class litigation was commenced.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
**18 U.S.C. § 2510, *et seq.***
***(On Behalf of Plaintiff & the Nationwide Class)***

148. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

149. Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class against Defendant.

150. The ECPA protects both the sending and receipt of communications.

151. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

152. A violation of the ECPA occurs where any person:

> intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication.

18 U.S.C. §§ 2511(1)(a), (c)-(d).

153. The ECPA also holds that:

> [A] person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication [ ] while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient.

18 U.S.C. § 2511(3)(a).

154. "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

155. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

156. "Contents" includes "any information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8).

157. Whenever Plaintiff and Nationwide Class members interacted with the Website and completed health screening questionnaires, Defendant, through the Tracking Technology it embedded in the Website, contemporaneously and intentionally intercepted the contents of Plaintiff's and Nationwide Class members' electronic communications while those communications were in transmission, and redirected such contents to third parties other than an addressee or intended recipient of such communication.

158. Whenever Plaintiff and Nationwide Class members interacted with the Website, Defendant, through at least the Taboola, Pinterest and TikTok web tracking technologies

embedded on the Website, contemporaneously and intentionally divulged the contents of Plaintiff's and Nationwide Class members' electronic communications while those communications were in transmission, to each third party other than an addressee or intended recipient of such communication.

159. Defendant intentionally intercepted and used the contents of Plaintiff's and Nationwide Class members' electronic communications for unauthorized purposes including disclosing and, on information and belief, profiting from, Plaintiff's and Nationwide Class members' health-related communications by transmitting the contents to third parties for marketing analytics and behavioral targeting purposes.

160. Plaintiff and Nationwide Class members did not authorize Defendant to acquire the content of their communications for purposes of sharing the sensitive health information contained therein with third parties.

161. Defendant's interception and disclosure of Plaintiff's and Nationwide Class members' electronic communications containing PHI and consumer health data violates HIPAA's criminal provisions, specifically 42 U.S.C. § 1320d-6, which makes it a crime to knowingly and in violation of HIPAA obtain or disclose individually identifiable health information.

162. Defendant intercepted Plaintiff's and Nationwide Class members' electronic communications for purposes other than providing healthcare services to Plaintiff and Nationwide Class members without authorization or consent and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

163. Defendant's interception of Plaintiff's and Nationwide Class members' electronic communications was undertaken in furtherance of and to facilitate the commission of the crime of unlawful disclosure of PHI under 42 U.S.C. § 1320d-6.

164. As a direct and proximate result of Defendant's violation of the ECPA, Plaintiff and Nationwide Class members were damaged by Defendant's conduct in that:

a. Defendant harmed Plaintiff's and Nationwide Class members' interest in privacy;

b. Sensitive and confidential health information that Plaintiff and Nationwide Class members intended to remain private between them and their healthcare provider is no more;

c. Defendant eroded the essential confidential nature of their relationship to Website users;

d. Defendant took something of value from Plaintiff and Nationwide Class members and derived benefit therefrom without Plaintiff's and Nationwide Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

e. Plaintiff and Nationwide Class members did not get the full value of the healthcare services for which they paid or sought, which included Defendant's duty to maintain confidentiality; and

f. Defendant's actions diminished the value of Plaintiff's and Nationwide Class members' personal health information.

165. Plaintiff, individually and on behalf of the Nationwide Class members, seeks all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION

**CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631, *et seq.***
***(On Behalf of Plaintiff & the California Subclass)***

166. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

167. Plaintiff brings this claim individually and on behalf of the members of the Class.

168. California Penal Code § 631 prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. Cal. Penal Code § 631(a).

169. At all relevant times, Plaintiff was accessing and using the Website to seek virtual healthcare services.

170. Plaintiff's communications with the Website, including responses to medical screening

questions, input of health information, and interactions with the Website's interface, constitute "communications" within the meaning of California Penal Code § 631.

171. Through the numerous first- and third-party software implementations embedded on the Website—including tracking technologies, cookies, web beacons, SDKs, pixels, and advertising networks—Defendant aided, agreed with, employed, or conspired with third parties to intercept Plaintiff's communications in real time as they were transmitted.

172. These tracking technologies constitute devices capable of intercepting communications within the meaning of California Penal Code § 631, as they are specifically designed to capture, record, and transmit user interactions and data inputs as they occur.

173. Defendant's assistance in the interception of Plaintiff's and California Subclass members' communications was accomplished without their consent. Specifically:

a. Defendant never obtained express consent from Plaintiff or California Subclass members before implementing tracking technologies;

b. The Website requires users to submit medical information through preliminary screening questions before they can create an account or review any privacy policies;

c. Tracking and interception begin immediately upon accessing the Website, before any opportunity for users to provide informed consent;

d. Defendant never provided clear, conspicuous notice that users' electronic communications containing medical information would be intercepted and shared with third parties;

e. Any purported consent was ineffective because the interception began before consent could be obtained and because the disclosures were inadequate under applicable law.

174. The intercepted communications include highly sensitive medical information that Plaintiff and California Subclass members provided with reasonable expectations of privacy and confidentiality, including:

a. Responses to health screening questions;

b. Medical history and current health conditions;

c. Prescription medication information;

d. Health insurance details; and

e. Other PHI.

175. Defendant's conduct was willful and intentional, as Defendant deliberately implemented tracking technologies knowing they would intercept users' electronic communications without proper consent.

176. As a direct and proximate result of Defendant's violations of applicable state privacy laws, Plaintiff and California Subclass members have suffered injury, including invasion of privacy, loss of confidentiality of medical information, and violation of their statutory rights.

177. Plaintiff continues to desire to use virtual healthcare services but has a reasonable fear that electronic communications will continue to be intercepted without consent if using the Website.

178. Under Cal. Penal Code § 637.2, Plaintiff and California Subclass members are entitled to:

a. Five thousand dollars ($5,000) per violation;

b. Three times the amount of actual damages sustained by the plaintiff; and

c. Equitable or declaratory relief.

179. Unless enjoined by this Court, Defendant will continue to intercept the communications of Plaintiff and California Subclass members and other Website visitors without their consent, causing irreparable harm for which there is no adequate remedy at law.

## THIRD CAUSE OF ACTION

**CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 632, *et seq.***
***(On Behalf of Plaintiff & the California Subclass)***

180. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

181. Plaintiff brings this claim individually and on behalf of the members of the California Subclass against Defendant.

182. California Penal Code Section 632(a) provides that:

> [E]very person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished[.]

183. California Penal Code Section 632(c) defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, or other public proceeding in which the public is entitled to attend, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

184. The communications between Plaintiff and class members and the Website constitute "confidential communications" within the meaning of Section 632(c) because class members had an objectively reasonable expectation of privacy with respect to their PII, PHI and consumer health data and because Defendant created the false expectation that users' information is not shared with third parties.

185. Defendant intentionally used an electronic recording device—specifically, the Tracking Technology embedded within the Website—to eavesdrop upon and record these confidential healthcare communications.

186. The Tracking Technology constitutes an "electronic amplifying or recording device" within the meaning of Section 632(a) because it is specifically designed to capture, record, and transmit user interactions and communications in real time for analytics and behavioral tracking purposes.

187. Defendant intentionally implemented and activated this recording technology within its Website with full knowledge that it would capture and record users' confidential healthcare communications, including their responses to sensitive health screening questions.

188. Defendant's recording of Plaintiff's and California Subclass members' confidential healthcare communications was accomplished without the consent of all parties to the communication, specifically:

a. Plaintiff and California Subclass members never consented to having their confidential healthcare communications recorded by third-party analytics companies;

b. Defendant never obtained express consent before implementing the recording technology;

c. Users were not informed that their healthcare communications would be recorded and transmitted to the Tracking Technologies;

d. No clear, conspicuous notice was provided regarding the scope and nature of the recording of confidential medical communications;

e. The recording began immediately upon opening the Website, before users had any opportunity to review privacy policies or provide informed consent.

189. Defendant's conduct was undertaken intentionally and with knowledge that the Tracking Technology would record confidential healthcare communications without proper consent from all parties.

190. The confidential communications that were unlawfully recorded include highly sensitive protected health information that individuals provided with reasonable expectations of medical confidentiality and HIPAA protection.

191. As a direct and proximate result of Defendant's violations of Section 632, Plaintiff and California Subclass members have suffered harm including invasion of their privacy rights, violation of medical confidentiality, and loss of control over their sensitive health information.

192. Unless enjoined and restrained by this Court, Defendant will continue to commit these violations. Plaintiff and California Subclass members have a reasonable fear that their confidential healthcare communications will continue to be unlawfully recorded if they use telehealth services through Defendant's platform.

193. Pursuant to California Penal Code Section 637.2, Plaintiff and California Subclass members are entitled to:

a. A preliminary and permanent injunction prohibiting Defendant from continuing their unlawful recording of confidential healthcare communications;

b. Statutory damages of $5,000 per violation;

c. Punitive damages for Defendant's willful and egregious violations of medical privacy; and

d. Any other relief the Court deems proper.

194. Plaintiff and California Subclass members seek all available remedies under California Penal Code Section 632 and related provisions for Defendant's unlawful recording of confidential healthcare communications.

## FOURTH CAUSE OF ACTION

**VIOLATIONS OF CONFIDENTIALITY OF MEDICAL INFORMATION ACT**
**California Civil Code §§ 56.06, 56.101, 56.10, 56.36**
***(On Behalf of Plaintiff & the California Subclass)***

195. Plaintiff incorporates each allegation set forth above as if fully set forth herein and further alleges as follows.

196. The CMIA defines "medical information" to mean "any individually identifiable information, in electronic or physical form," that is related to a person's "medical history, mental health application information, mental or physical condition, or treatment."

197. Medical information is "individually identifiable" if it includes or contains "any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual." Cal. Civ. Code § 56.05(j).

198. The Website, which offers (1) virtual healthcare services for weight loss and metabolic health, (2) preliminary health screening questions that assess medical conditions, medications, and health history, and (3) online booking and payment for healthcare providers, constitutes a provider of health care services.

199. The information submitted by Website users through health screening questions, questionnaires, and account creation—and subsequently collected, maintained, and disclosed by Defendant—is medical information because it is individually identifiable information relating to a patient's medical condition and plan of treatment.

200. That medical information includes but is not limited to Website users' (1) personal contact information, (2) health conditions and concerns collected through the health screening quiz, (3) medical history collected before account creation, (4) responses to health screening questions about weight, medications, and existing conditions, and (5) treatment preferences and goals.

201. Plaintiff inputted private, personal details and sensitive medical information into the Website, including responses to health screening questions about medical conditions before being permitted to create an account or review privacy policies.

202. Plaintiff visited the Website to facilitate treatment of health conditions and obtain virtual healthcare services.

203. California Civil Code § 56.06(b) states that any "business that offers software or hardware to consumers, including a mobile application or other related device that is designed to maintain medical information in order to make the information available to an individual or health care provider, or for the diagnosis, treatment, or management of a medical condition of the individual, shall be deemed to be a provider of health care subject to the requirements of this part."

204. As a provider of a website and digital health service that facilitates the diagnosis, treatment, and management of medical conditions, Defendant is deemed to be a provider of health care and is subject to the standards of confidentiality with respect to medical information disclosure that are required by the CMIA.

205. As alleged in detail above, through the Tracking Technology embedded on the Website, Defendant knowingly shared Plaintiff's and California Subclass members' medical information with and disclosed that information to at least Pinterest, Taboola, TikTok, and Microsoft without Plaintiff's and California Subclass members' knowledge or consent.

206. In so doing, Defendant violated Cal. Civ. Code § 56.06(f) by failing to maintain the confidentiality of users' private and personal medical information.

207. Defendant also violated Cal. Civ. Code § 56.101(a) by failing to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information.

208. Instead, Defendant allowed third parties to access and collect Plaintiff's and California Subclass members' private medical information through the Tracking Technology, which these third parties used for their own purposes including targeted advertising and data analytics.

209. California Civil Code § 56.10(a) further provides that a provider of health care "shall not disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization."

210. Defendant violated this section of the CMIA when it disclosed Plaintiff's and California Subclass members' medical information to Pinterest, Taboola, TikTok, and Microsoft through the Tracking Technology without first obtaining Plaintiff's and California Subclass members' authorization to do so.

211. The Website requires users to submit medical information through preliminary screening questions before they can create an account, access services, or review privacy policies, thereby collecting medical information without providing users the opportunity to review data sharing practices or provide informed consent.

212. Defendant's conduct, as described above, violated California Civil Code §§ 56.06, 56.101, and 56.10.

213. Under Civil Code § 56.36(b)(1), Defendant is liable to Plaintiff and each of the California Subclass members for statutory damages of $1,000 per violation, even in the absence of proof of actual damages.

## FIFTH CAUSE OF ACTION

### VIOLATIONS OF CALIFORNIA CONSUMER PRIVACY ACT
**California Civil Code § 1798.100(a) and (b)**
***(On Behalf of Plaintiff & the California Subclass)***

214. Plaintiff incorporates each allegation set forth above as if fully set forth herein and further alleges as follows.

215. Civil Code § 1798.100(a) requires that a "consumer shall have the right to request that a business that collects a consumer's personal information disclose to that consumer the categories and specific pieces of personal information the business has collected."

216. Civil Code § 1798.100(b) mandates that a "business that collects a consumer's personal information shall, at or before the point of collection, inform consumers as to the

categories of personal information to be collected and the purposes for which the categories of personal information shall be used."

217. These provisions establish a clear requirement: businesses must provide transparent notice about data collection and use at or before the point when personal information is collected.

218. Defendant violated § 1798.100(b) by collecting personal information through the Website before providing the required disclosures. Specifically, the Website requires users to complete detailed health screening questions before they can create an account, using screening questions that collect sensitive medical information including health conditions and medications. Users must submit this information before they have any opportunity to review privacy policies or data use disclosures, and no notice is provided at or before collection regarding the categories of information collected or purposes of use.

219. The Website's registration flow is specifically designed to extract medical information from users before they can access any privacy disclosures, in direct violation of the "at or before the point of collection" requirement.

220. Even after collection, Defendant's disclosures are inadequate because they fail to inform consumers that their medical information will be: (a) shared with third-party advertising networks including Pinterest, Taboola, TikTok, and Microsoft; (b) used for behavioral tracking and analytics; and (c) used for purposes beyond healthcare delivery.

221. Defendant's failure to provide clear disclosure at or before collection deprived Plaintiff and California Subclass members of their ability to make informed decisions about whether to share their sensitive medical information.

222. As a direct result of these violations, Plaintiff and California Subclass members suffered harm, including unknowing disclosure of medical information for commercial purposes and deprivation of their privacy rights under the CCPA. Defendant has had more than 30 days' notice of its beach of duties and has failed to cure.

223. Plaintiff and California Subclass members are entitled to declaratory relief that Defendant's practices violate § 1798.100(a) and (b), injunctive relief requiring compliance with disclosure requirements, and any other relief the Court deems proper.

## SIXTH CAUSE OF ACTION

**VIOLATIONS OF CALIFORNIA CONSUMER PRIVACY ACT**
**California Civil Code § 1798.100(c)**
***(On Behalf of Plaintiff & the California Subclass)***

224. Plaintiff incorporates each allegation set forth above as if fully set forth herein and further alleges as follows.

225. The CCPA, at Civil Code § 1798.100(c), provides that a "business shall not collect additional categories of personal information or use personal information collected for additional purposes without providing the consumer with notice consistent with this section."

226. This provision establishes a fundamental purpose limitation principle: businesses may only use personal information for the specific purposes disclosed to consumers at or before the point of collection.

227. Defendant collected Plaintiff's and California Subclass members' personal information, including sensitive medical information, through the Website ostensibly for the purpose of providing virtual healthcare services, including weight loss treatment and metabolic health services.

228. At the time of collection, Defendant represented that the medical information would be used to facilitate healthcare services, connect patients with physicians, and manage treatment.

229. However, Defendant subsequently used and continues to use this medical information for additional, undisclosed purposes, including but not limited to: (a) targeted advertising through third-party advertising networks including Pinterest, Taboola, TikTok, and Microsoft; (b) commercial data monetization; (c) behavioral tracking and profiling; and (d) marketing optimization and lead generation.

230. These advertising and analytics purposes are materially different from and incompatible with the healthcare purposes for which the information was collected.

231. Defendant never provided notice to Plaintiff or California Subclass members that their medical information would be used for advertising, analytics, or other commercial purposes beyond healthcare delivery.

232. Defendant's use of medical information for undisclosed purposes violated §

1798.100(c) and caused harm to Plaintiff and California Subclass members, including loss of privacy, unauthorized commercialization of their medical data, and exposure to targeted advertising based on their health conditions. Defendant has had more than 30 days' notice of its beach of duties and has failed to cure.

233. Plaintiff and California Subclass members are entitled to injunctive relief, actual damages, and any other relief the Court deems proper for these violations.

## SEVENTH CAUSE OF ACTION

### VIOLATIONS OF CALIFORNIA CONSUMER PRIVACY ACT
### California Civil Code § 1798.150(a)(1)
***(On Behalf of Plaintiff & the California Subclass)***

234. Plaintiff incorporates each allegation set forth above as if fully set forth herein and further alleges as follows.

235. In 2018, California consumers voted into law the California Consumer Privacy Act of 2018 ("CCPA") which, among others, provides California consumers the right to learn what information a business has collected about them, to delete their personal information, to stop businesses from selling their personal information, including using it to target them with ads, and to hold businesses accountable if they do not take reasonable steps to safeguard protected information.

236. In further protecting consumers' rights, including the constitutional right to privacy, the CCPA states that one purpose and intent of the act is to allow consumers "to control the use of their personal information, including limiting the use of their sensitive personal information, the unauthorized use or disclosure of which creates a heightened risk of harm to the consumer," and to provide consumers with "meaningful options" over how information is collected, used, and disclosed.

237. To that end, businesses are required to inform consumers specifically and clearly about how those businesses collect and use personal information and how consumers can exercise their rights and choices.

238. Subsection (e) of § 1798.100 requires a business that collects consumer personal information to "implement reasonable security procedures and practices appropriate to the nature

of the personal information to protect the personal information from unauthorized or illegal access, destruction, use, modification, or disclosure in accordance with Section 1798.81.5."

239. Similarly, California Civil Code § 1798.81.5(b) provides that a "business that owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

240. The CCPA defines "personal information" to include an individual's first name or first initial and last name in combination with medical information, health insurance information, unique biometric data, and other sensitive categories. California Civil Code § 1798.81.5(d)(1)(A).

241. Subsection (d)(2) of § 1798.81.5 further defines "medical information" as "any individually identifiable information, in electronic or physical form, regarding the individual's medical history or medical treatment or diagnosis by a health care professional."

242. As alleged in detail above, Defendant fails to adequately disclose that users' sensitive medical information collected through preliminary screening questions and medical questionnaires is shared with Pinterest, Taboola, TikTok, and Microsoft.

243. The Website requires users to submit detailed medical information through screening questions before they can create an account or review privacy policies, thereby collecting sensitive personal information without first providing users the opportunity to understand how their data will be shared.

244. Defendant's sharing of medical information with third parties including Pinterest, Taboola, TikTok, and Microsoft for analytics, advertising, and commercial purposes goes well beyond the disclosed purposes of facilitating virtual healthcare services and is a clear breach of Defendant's duties required under Civil Code § 1798.150(a)(1). Defendant has had more than 30 days' notice of its beach of duties and has failed to cure.

245. Further, Defendant's disclosure to third parties of and the unauthorized access by third parties to Plaintiff's and California Subclass members' personal information, including medical information, through the Tracking Technology constitute violations of Defendant's duty

to implement and maintain reasonable security procedures and practices to safeguard such sensitive information, and thus constitute a violation of § 1798.150(a)(1) of the CCPA.

246. Under Civil Code § 1798.150(a)(1)(A), Plaintiff and California Subclass members each are entitled to the greater of their actual damages or statutory damages of not less than $100 and up to $750 per consumer per incident, plus, under § 1798.150(a)(1)(C), any other relief that the court deems proper.

## EIGHTH CAUSE OF ACTION

**BREACH OF CONTRACT**
***(On Behalf of Plaintiff & the Nationwide Class)***

247. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

248. Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class against Defendant.

249. Defendant's Privacy Policy, accessible through the Website, constitutes a binding contract between Defendant and users of the Website, including Plaintiff and Class members, or alternatively, the representations therein constitute express warranties upon which Plaintiff and Nationwide Class members reasonably relied.

250. In its Privacy Policy, Defendant made explicit promises regarding the handling of user data, including the representation that Defendant "does not, to the best of our knowledge, sell or rent personal information that we have collected or retained about you to any other third-party for any purpose."

251. Defendant's Privacy Policy further represents that Defendant is "committed to the principles of patient rights, privacy, and HIPAA compliance. Our dedicated efforts are focused on providing a secure and confidential environment for patient information, fostering trust and transparency in our healthcare practices."

252. Defendant's Privacy Policy also states that "explicit authorization is obtained before using PHI for marketing purposes," representing to users that their health information would not be used for marketing without their express consent.

253. As consideration for these contractual promises, Plaintiff and Nationwide Class members provided valuable consideration to Defendant in the form of their personal information, including sensitive medical information, as well as their time, attention, and in many cases, payment for services.

254. Plaintiff and Nationwide Class members accepted Defendant's offer and agreed to these terms by using the Website and providing their personal and medical information in reliance on Defendant's promises regarding data protection and confidentiality.

255. Defendant materially breached its contractual obligations to Plaintiff and Class members by:

a. Sharing user data with third parties, including Taboola, Pinterest, and TikTok, in direct violation of its promise that Defendant "does not . . . sell or rent personal information";

b. Transmitting users' PHI to advertising and analytics platforms for marketing purposes without obtaining the "explicit authorization" promised in the Privacy Policy;

c. Failing to uphold "the principles of patient rights, privacy, and HIPAA compliance" by allowing third-party tracking technologies to intercept and collect users' sensitive health information in real time;

d. Using PHI for targeted advertising purposes, including retargeting and lookalike audience building, without user consent or knowledge; and

e. Permitting third parties to create persistent user profiles combining health information with broader browsing activity, in violation of its representations regarding data protection.

256. Defendant's breach was willful and intentional. Defendant made the deliberate decision to install tracking technologies from Taboola and TikTok on every page of its health intake quiz and onboarding section, and Pinterest in the onboarding section, knowing that these technologies would transmit user data to third parties in direct contravention of its Privacy Policy representations.

257. At the time of contracting, Defendant knew or should have known that its representations regarding data sharing were false, as Defendant had already implemented the Tracking Technology that transmitted user data to third parties.

258. Plaintiff and Nationwide Class members performed all conditions, covenants, and

obligations required of them under the contract, including providing their personal and medical information to Defendant.

259. Plaintiff and Nationwide Class members reasonably relied on Defendant's contractual promises when deciding to use the Website and provide their sensitive health information. Had Plaintiff and Nationwide Class members known that Defendant would share their data with third-party advertising platforms in violation of its Privacy Policy, they would not have used the Website or provided their information.

260. As a direct and proximate result of Defendant's breach of contract, Plaintiff and Nationwide Class members have suffered damages, including but not limited to:

a. The loss of the benefit of the bargain, as they did not receive the data protection and confidentiality they were promised;

b. The loss of the economic value of their personal and medical information, which was exploited for Defendant's commercial benefit without authorization;

c. The diminution in value of their personal and medical information, which has been disseminated to third parties and incorporated into advertising profiles;

d. Invasion of their privacy interests and loss of control over their sensitive health information; and

e. Exposure to targeted advertising based on their medical conditions, causing emotional distress and anxiety.

261. Plaintiff and Nationwide Class members are entitled to compensatory damages in an amount to be proven at trial, including the monetary value of the personal and medical information that was wrongfully shared with third parties, as well as consequential damages flowing from Defendant's breach.

262. In the alternative, Plaintiff and Nationwide Class members are entitled to restitution and disgorgement of any profits Defendant obtained through its breach, including any revenue or value received from sharing user data with third-party advertising platforms.

263. Plaintiff and Nationwide Class members further seek declaratory relief establishing that Defendant's data sharing practices constitute a breach of its Privacy Policy, and injunctive

relief requiring Defendant to comply with its contractual obligations.

## NINTH CAUSE OF ACTION

### UNJUST ENRICHMENT
### (*On Behalf of Plaintiff & the Nationwide Class*)

264. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

265. Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class against Defendant.

266. Defendant has been unjustly enriched at the expense of Plaintiff and Nationwide Class members through its unauthorized collection, use, and monetization of their PHI and personal data.

267. Plaintiff and Nationwide Class members conferred a benefit upon Defendant by providing valuable PHI, including sensitive health data, medical histories, and personal identifiers, through their use of the Website.

268. Individual health records command premium prices in data markets, valued as much as 50 times more than credit card information due to their comprehensive nature and permanence.

269. Health information commands exceptional value due to its predictive power and marketing utility.

270. Defendant received and retained this benefit by intercepting, collecting, and transmitting Plaintiff's and Nationwide Class members' PHI to third parties through embedded technology without authorization or consent.

271. Defendant has been unjustly enriched through several mechanisms:

a. Data Monetization: Defendant derives commercial value from sharing users' PHI with third parties for marketing analytics, behavioral targeting, and user profiling purposes;

b. Cost Avoidance: Defendant avoided the substantial costs of obtaining proper consent, implementing adequate privacy protections, and securing lawful access to

this valuable health data;

c. Competitive Advantage: Defendant gained unfair competitive advantages by leveraging detailed health data profiles to optimize its platform and marketing without bearing the costs associated with compliant data collection.

d. Enhanced Platform Value: The unauthorized collection of comprehensive user health data increases the overall value and effectiveness of Defendant's telehealth platform.

272. Defendant obtained this benefit through unlawful interception and unauthorized disclosure of PHI in violation of HIPAA, ECPA, and/or Cal. Penal Code §§ 631-632.

273. Whereas Plaintiff and Nationwide Class members provided this valuable information in the context of seeking confidential healthcare services with a reasonable expectation of privacy and HIPAA compliance, Defendant actively concealed its data collection and sharing practices from users who were unaware their health information was being intercepted and monetized.

274. Defendant's retention of these benefits violates fundamental principles of fairness and equity, as Defendant has profited from the unauthorized exploitation of some of the most sensitive and valuable personal information—PHI—without providing any compensation or benefit to the individuals whose privacy was violated.

275. Plaintiff and Nationwide Class members have no adequate remedy at law for Defendant's Unjust Enrichment, as they cannot recover the specific value of their appropriated health data through traditional damages calculations.

276. As a direct and proximate result of Defendant's Unjust Enrichment, Plaintiff and Nationwide Class members are entitled to restitution and disgorgement of all benefits, profits, and value that Defendant has obtained through the unauthorized collection and use of their PHI.

277. Plaintiff and Nationwide Class members seek judgment requiring Defendant to disgorge all profits, benefits, and value obtained through its unlawful conduct, together with interest thereon, and such other relief as the Court deems just and proper.

## TENTH CAUSE OF ACTION

### INVASION OF PRIVACY
### (*On Behalf of Plaintiff & the California Subclass*)

278. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

279. Plaintiff brings this claim individually and on behalf of the members of the California Subclass against Defendant.

280. The right to privacy in California's Constitution creates a right of action against private entities such as Defendant.

281. Plaintiffs' and Class members' expectation of privacy is deeply enshrined in California's Constitution. Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among those are enjoying and defending life and liberty, acquiring, possessing, and protecting property and obtaining safety, happiness, and privacy." The phrase "and privacy" was added in 1972 after voters approved a proposed legislative constitutional amendment designated as Proposition 11. Critically, the argument in favor of Proposition 11 reveals the legislative intent was to curb business' control over unauthorized collection and use of consumers' personal information:

> The right of privacy is the right to be left alone ... It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.

282. The principal purpose of this constitutional right was to protect against unnecessary information gathering, use, and dissemination by public and private entities, including Defendant.

283. As described herein, Defendant has intruded upon the following legally protected privacy interests by violating the Wiretap Act and the California Invasion of Privacy Act as alleged herein and because Defendant publicly promised users' information is not shared with third parties.

284. Plaintiff and California Subclass members had a reasonable expectation of privacy

under the circumstances in that Plaintiffs and Class members could not reasonably expect Defendant would commit acts in violation of federal and state civil and criminal law.

285. Plaintiff and California Subclass members also had a reasonable expectation of privacy under the circumstances in that Defendant affirmatively promised users (including Plaintiff and California Subclass members) that it would not procure third parties to track their online activity and PHI while they were using Defendant's Website.

286. Defendant's actions constitute a serious invasion of privacy because, inter alia, it violated several criminal laws, including the Wiretap Act and the California Invasion of Privacy Act, invaded the privacy rights of millions of Americans (including Plaintiff and California Subclass members) without their consent, and constituted the unauthorized taking of valuable information from millions of Americans through deceit.

287. Committing criminal and tortious acts against millions of Americans constitutes an egregious breach of social norms that is highly offensive.

288. The surreptitious and unauthorized tracking of the internet communications of millions of Americans, particularly where, as here, Defendant promised to protect their privacy, constitutes an egregious breach of social norms that is highly offensive.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kristy Wilce individually and on behalf of all others similarly situated, respectfully requests that this Court enter judgment against Defendant Willow Health Services, Inc. and in favor of Plaintiff and the Classes, and grant the following relief:

A. Certify this case as a class action on behalf of the Classes defined above, appoint Plaintiff as class representative, and appoint Plaintiff's counsel as class counsel;

B. Enter a judgment finding that Defendant's actions, as described herein, violate the statutes and common law referenced herein;

C. Award injunctive and other equitable relief as necessary to protect the interests of Plaintiff and the Classes including:

i. An order prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. An order requiring Defendant to implement proper notice and consent mechanisms before using tracking technology; and

iii. An order requiring Defendant to destroy all data collected through unlawful monitoring practices.

D. Award statutory damages to Plaintiff and the Classes under the Electronic Communications Privacy Act, 18 U.S.C. § 2520(c)(2), in the amount of the greater of $100 per day for each day of violation or $10,000 per violation, or actual damages and any profits made by Defendant, whichever is greater;

E. Award statutory damages to Plaintiff and the California Subclass under the California Invasion of Privacy Act Cal. Penal Code § 631 in the amount of $5,000 per violation, or three times the amount of actual damages, whichever is greater.

F. Award statutory damages to Plaintiff and the California Subclass under the Confidentiality of Medical Information Act, Cal. Civ. Code § 56.36(b)(1), in the amount of $1,000 per violation;

G. Award statutory damages to Plaintiff and the California Subclass under the California Consumer Privacy Act, Cal. Civ. Code § 1798.150(a)(1)(A), in the amount of not less than $100 and not greater than $750 per consumer per incident, or actual damages, whichever is greater;

H. Award statutory damages to Plaintiff and the California Subclass under the California Invasion of Privacy Act, Cal. Penal Code § 632, in the amount of $5,000 per violation, or three times the amount of actual damages, whichever is greater;

I. Award compensatory damages, nominal damages, and punitive damages to Plaintiff and the California Subclass for Defendant's invasion of privacy in violation of the California Constitution, Article I, Section 1, in an amount to be determined at trial;

J. Award compensatory damages to Plaintiff and the Classes for Defendant's breach of contract, including all damages proximately caused thereby, in an amount to be determined at trial;

K. Award restitution and disgorgement of Defendant's Unjust Enrichment, including all revenue derived from their unlawful business practices;

L. Award Plaintiff and the Classes reasonable litigation expenses and attorneys' fees;

M. Award Plaintiff and the Classes pre- and post-judgment interest to the extent allowable; and

N. Award such other and further relief as equity and justice may require.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury for all issues so triable.

Dated: July 15, 2026

Respectfully submitted,

*/s/ Victor Sandoval*
Victor Sandoval (California Bar No. 344461)
Lucas Coughlin*
**ALMEIDA LAW GROUP LLC**
3415 S. Sepulveda Blvd. Ste 1121
Los Angeles, CA 90034
310-896-5813
victor@almeidalawgroup.com
luke@almeidalawgroup.com

**Pro hac vice application pending*
*Attorneys for Plaintiff & the Putative Classes*